**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **DONNA J. McDANIEL,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 5:07-cv-7 (CAR)** |
| | : | |
| **HARTFORD LIFE AND ACCIDENT** | : | |
| **INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

In this case, Plaintiff seeks to recover benefits from a long-term disability policy ("the Policy") provided as part of an employee welfare benefits plan ("the Plan") sponsored by her employer, Quorum Health Group, Inc., and administered and funded by Defendant Hartford Life and Accident Insurance Company ("Hartford").[1]  The case is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.  Before the Court are motions for summary judgment by the Plaintiff and the Defendant.  Upon review of the claims file, the arguments of counsel, and the relevant legal authorities, the Court finds that Hartford's decision to deny Plaintiff's claim for benefits was reasonable and was not arbitrary or capricious.  Accordingly, Hartford's motion for summary judgment (Doc. 16) is hereby **GRANTED** and Plaintiff's motion for summary judgment (Doc. 18) is hereby **DENIED**.

---

[1]The group policy was originally issued by Continental Casualty Company ("CNA").  Hartford purchased the assets of CNA, including the group policy at issue in this case, in 2004.  For the sake of simplicity, this Order uses the name "Hartford" to refer to the Plan administrator throughout the period in question.

**BACKGROUND**

Plaintiff began receiving disability benefits under the Plan on September 17, 1996, and continued to receive the benefits until April 17, 2005, when Hartford determined that she was not "totally disabled" and discontinued her benefits.  The Policy provides two separate definitions for the term "Total Disability."  During the first twenty-four months of coverage, the Policy's definition of disability is an "own occupation" definition, which provides that an insured employee is considered totally disabled if he is:

> (1) continuously unable to perform the substantial and material duties of his regular occupation;
> (2) under the regular care of a licensed physician other than himself; and
> (3) not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.

Policy, Def.'s Ex. 1 p. 3.  After the first two years of coverage, the definition shifts to an "any occupation" definition, which provides coverage if the insured is:

> (1) continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience; and
> (2) under the regular care of a licensed physician other than himself.

Id. at 7.

It is undisputed that Plaintiff was totally disabled and eligible for benefits during the twenty-four month "own occupation" period of the Policy, as there is no question that she was no longer capable of performing the duties of her prior occupation.  At the time of her injury, Plaintiff was employed as a registered nurse at Quorum.  On January 18, 1996, she injured her back while attempting to move a patient.  Her injury aggravated pre-existing back injuries.  She left work as a result of that injury, and since leaving work has been unable to return.  There is no dispute that her

2

injuries make her unable to perform the substantial and material duties of her prior occupation, which duties included pushing and pulling patients into and out of hospital beds and lifting and carrying 25-50 pounds two to three times per day.

Although Hartford concedes that Plaintiff was totally disabled as to her own occupation, it contends that Plaintiff remains capable of employment in sedentary work and therefore is not totally disabled as to any occupation.  Nevertheless, Hartford and its predecessor continued to pay Plaintiff's benefits after the two-year own occupation period ended in 1998, until it finally terminated her benefits in 2005.  During that period of six and a half years, Hartford attempted to discontinue Plaintiff's benefits three times.  Hartford first notified Plaintiff that it was discontinuing coverage on October 29, 1998, based on a Functional Capacity Examination (FCE) and Independent Medical Examination (IME) that found Plaintiff to be capable of light duty, sedentary work.  An appeals committee overturned the denial of benefits on its finding that MRI examinations of Plaintiff's spine showed "sufficient objective abnormalities . . . to substantiate [her] subjective complaints of pain."  R0604.

On August 13, 2003, Hartford again notified Plaintiff that it was terminating her benefits. An appeals committee affirmed the termination of benefits, citing a 1999 IME and a 2001 FCE, both of which reported Plaintiff to be capable of sedentary work.[2]  These examinations were conducted at the request of Plaintiff's workers compensation carrier, and were not provided to Hartford until September 2003.  Hartford subsequently reinstated Plaintiff's benefits for reasons that are not

_____

[2]Between the first denial of benefits in 1998 and the second in 2003, Hartford also attempted to negotiate a settlement of Plaintiff's claim for benefits.  On September 27, 2001, after Plaintiff's claim for Social Security disability benefits was rejected by an Administrative Law Judge, Hartford made a settlement offer of $75,000.00. R0484.  Plaintiff rejected this offer.  Hartford later offered $125,000.00, which Plaintiff also rejected.  R0427.  The settlement offer was withdrawn on October 26, 2003.  R0059.

entirely clear from the record, perhaps related to a complaint Plaintiff filed with Georgia's Insurance Commissioner.

On March 21, 2005, Hartford notified Plaintiff a third time that her benefits were being discontinued. This termination was based on the prior FCEs and IMEs in Plaintiff's record, with additional information from surveillance conducted on Plaintiff in November and December 2004 and from an interview with Plaintiff in January 2005. Plaintiff appealed the decision. During the appeal process, Hartford requested that Plaintiff undergo a third FCE. The results of this FCE were the same as the first two. The third FCE report observed that Plaintiff was capable of performing "sedentary-light" work eight hours per day, forty hours per week. R0214. On October 27, 2005, Hartford informed Plaintiff that the appeals committee had affirmed the decision to discontinue benefits. Plaintiff subsequently filed the present lawsuit.

## DISCUSSION

Hartford's decision to deny Plaintiff's claim for benefits is subject to review under a deferential standard, and may be reversed only if it is found to be arbitrary and capricious. This deferential standard applies where a plan provides the administrator or a fiduciary "discretionary authority to determine eligibility for benefits." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101115 (1989). It is undisputed in this case that the Plan vested Hartford with such discretionary authority. See Pl.'s M. for Summary Judgment p. 15. It is only necessary to apply the deferential standard of review when the administrator's decision is found to be wrong on *de novo* reveiew.

In this case, the Court's *de novo* review affirms Hartford's finding that Plaintiff's disability did not meet the Policy's definition of a total disability. The evidence that Plaintiff retained the capacity to work in a sedentary position outweighs the evidence that her disability rendered her

unable to work in any capacity. Because Hartford's decision was correct based on the evidence that was before it, even in the absence of any deference to Hartford. The additional deference afforded by the arbitrary and capricious standard of review only adds support to a finding in Hartford's favor.

## A.    De Novo Review

In evaluating a claims decision under the arbitrary and capricious standard, a court must first consider the administrator's decision *de novo* and determine whether the administrator was "wrong" to deny benefits. Doyle v. Liberty Life Assurance Co. of Boston, 511 F.3d 1336, 1340, *rev'd, on other grounds*, ___ F.3d ___, 2008 WL 4272748 (11th Cir. 2008). An administrator's decision is wrong if the court disagrees with its decision. Id. In other words, the court must "stand in the shoes of the administrator and start from scratch, examining all the evidence before the administrator as if the issue had not been decided previously." Stiltz v. Metropolitan Life Ins. Co., No. 1:05-cv-3052-TWT, 2006 WL 2534406, at *6 (N.D.Ga. Aug. 30, 2006), aff'd 244 Fed. App'x. 260 (11th Cir. 2007). If the court agrees with the administrator's decision, the denial may be affirmed without further inquiry. Id.

Under the terms of the Plan, Plaintiff has the burden of proving her continuing disability. Hartford's past payment of benefits does not shift the burden to Hartford to establish a change of condition. See Onofrieti v. Metropolitan Life Ins. Co., 320 F.Supp.2d 1250, 1254 (M.D.Fla. 2004). The Eleventh Circuit has never held that prior payment of benefits is a relevant consideration when a court reviews the denial of benefits under ERISA. Stilz v. Metropolitan Life Ins. Co., 244 Fed. Appx. 260, 265 (11th Cir. 2007) (unpublished opinion). The prior payment of benefits does not create a presumption in favor of continued coverage.

On *de novo* review, after a full examination of all the evidence before Hartford, the Court reaches the same conclusion that Hartford reached, and finds that the evidence favoring a denial of benefits outweighs the evidence that Plaintiff was incapable of performing any occupation for which she was qualified.  There is no question that Plaintiff's back injuries placed real limitations on her, by restricting her ability to lift objects and by causing her pain and discomfort.  The question in this case is whether her condition was such that it made her unsuitable for employment in any capacity.  The more persuasive evidence indicates that despite her injuries Plaintiff retained the ability to work in a sedentary occupation.  Supporting Plaintiff's claim of total disability there are Plaintiff's own representations as to her limitations and the pain she experienced, with the opinion of her personal doctors that she was unable to work.  Supporting Hartford's finding are three Functional Capacity Evaluations and two Independent Medical Examinations that reach the conclusion that Plaintiff could perform full-time sedentary work.  In addition, there is a surveillance video that slightly diminishes the credibility of Plaintiff's representations as to her limitations.  For the reasons set forth below, the evidence in Hartford's favor is more persuasive.

The objective nature of Plaintiff's physical condition is shown in reports of MRI tests conducted in February 1998, which show degenerative effects at all levels of Plaintiff's spine.  As to Plaintiff's lumbar spine, the MRI showed

> Small L 3/4 right posterolateral disc herniation which partially compromises the right neural foramen.
> Small T 12/L 1 posterior disc herniation causing a small ventral impression upon the thecal sac.
> Small L 2/3 disc bulge causing a small ventral impression upon the thecal sac.
> L 1/2, L 2/3 and L 4/5 disc desiccation.
> Degenerative disease.

R0649.  As to Plaintiff's thoracic spine, the MRI showed

> Small chronic T 11 and T 12 vertebral body fractures.
> Small T 7/8 through T 9/10 anterior disc bulges.
> Degenerative disease.
> Desiccation of all thoracic discs.

R0650.  As to Plaintiff's cervical spine, the MRI showed

> Small C 5/6 right paracentral disc herniation causing a small impression upon the right ventral aspect of the thecal sac.  The size of the disc herniation was slightly increased relative to 2/1/96.
> Small C 6/7 disc bulge causing a small ventral impression upon the thecal sac.
> Desiccation of all cervical discs.
> Straightening of the cervical spine, probably secondary to muscular spasm and/or strain.

R0651.  These MRI reports demonstrate that Plaintiff had some degree of disability as a result of her back injuries, but by themselves they do not establish that the injuries were so incapacitating as to make Plaintiff completely unable to work in any gainful occupation.

Plaintiff's claim of total disability is supported primarily by her representation as to the effects of her injuries, affirmed by the opinions of her personal doctors.  Plaintiff has represented throughout her correspondence with Hartford that the pain caused by her back condition prevents her from performing any occupation.  She has maintained that she is unable to sit for more than thirty minutes at a time and must lie down to rest at least four times a day.  R0425-26.  Her claim of disability is supported by her chiropractor, Dr. Robert Lokey, and by her primary care doctors, Dr. Valerie Jones-Freeman and Dr. Jasper Hogan.  In a letter dated December 30, 1998, Dr. Lokey wrote:

> After careful review of Ms. McDaniel's case and after treating her for the past two years, I cannot in good conscience recommend that she return to work of any kind. Ms. McDaniel's treatment here is palliative and not curative at this point.   With regular care, her symptoms are manageable without surgery.    However, Ms. McDaniel must perform even the simplest of [tasks] with great care and deliberation. It is therefore my professional opinion the Ms.McDaniel cannot and should not return to work.

R0131.  In a letter dated June 6, 2006, Dr. Lokey wrote that Plaintiff "continues to suffer from headaches, neck pain, upper back pain, mid back pain, and low back pain," and reiterated his opinion that she "cannot perform in any normal working situation."   R0101.  On February 16, 2005, Dr. Jones-Freeman wrote that Plaintiff

> still suffers from headache, neck pain, upper and lower back pain with paresthesia and pain that radiates to arms and legs. . . .  She remains physically disabled and cannot be sitting up for more than 30 minutes without needing to rest.  She is not allowed to bend, reach, stretch, squat nor lift more than 10 pounds.  She will never be able to return to work and is not in an exercise program.

R0229.  Prior to Dr. Jones-Freeman, Plaintiff's primary care physician was Dr. Jasper Hogan, a medical doctor associated with Dr. Lokey's chiropractic practice.  In his letter dated August 25, 2003, Dr. Hogan wrote that Plaintiff

> is not a candidate for any type of work for gainful employment because she cannot stand or sit for any significant length of time due to the fact that she has to change positions to alleviate pain.  Every four hours she has to lie down because of her pain.

R0234.

Whereas Plaintiff and her personal physicians maintain that she is unable to perform any occupation, her contention is contradicted in the record by the results of FCEs and IMEs, all of which reach the conclusion that Plaintiff is capable of full-time, sedentary work.  The first FCE

8

(R0266) was conducted on November 12, 1996, by therapists at Work Horizons in Macon. The therapists conducted a physical examination of Plaintiff that included range of motion tests, manual muscle tests, neurological tests, and material handling tests. They also reviewed Plaintiff's medical records and her self-reports as to her daily activities and pain levels. Plaintiff reported daily activities that included a 25-minute walk in the morning, a twenty minute walk in the afternoon, preparing breakfast for her son, taking her son to school, laundry, mopping, cleaning, and upper back exercises. R0267-68. She stated that she experienced increased pain after being up for 4-5 hours without rest or a nap and that she could not sit for more than 20 minutes. Based on their examination, the therapists concluded that Plaintiff was capable of sedentary work and recommended a return to work, with material handling limitations of 15 pounds from floor to waist and 10 pounds from waist to shoulder level. R0271.

Plaintiff's second FCE (R0244) was conducted on June 14, 2001, by a physical therapist and a functional capacity evaluator at Macon Occupational Medicine. The evaluators conducted a variety of tests including lifting, walking, stair climbing, ladder climbing, squatting, bending, and coordination tests. They noted that Plaintiff had a normal gait pattern; good coordination and balance; appropriate speed and motion; a normal active range of motion in her elbows, wrists, hands, and lower extremities; and good body mechanics. Her significant deficits included a slightly decreased active range of motion associated with the lumbar and cervical spine and the shoulders; decreased strength in the right shoulder and elbow; decreased tolerance for repetitive and sustained overhead lifting and overhead work; decreased tolerance for static standing in one position; and decreased tolerance for static bending. R0245. Based on their testing, they concluded that

Plaintiff's abilities fell within the Sedentary-Light level and recommended that Plaintiff undergo a conditioning program or gradual return to work due to deconditioning from being out of work. Id.

Plaintiff's third FCE (R0190) was conducted on August 30, 2005, by Macon Occupational Medicine. The functional capacity evaluator who performed the 2001 evaluation directed the 2005 evaluation, with the assistance of a different physical therapist. The evaluation report notes essentially the same abilities and deficits as the 2001 report, with the additional finding that Plaintiff's gait pattern deviated from normal when rising from a squatted or kneeling position and that she had decreased total body conditioning and endurance. R0191-92. The evaluators again concluded that Plaintiff abilities fell within the Sedentary-Light level. R0192.

Along with the FCE reports, Hartford's record includes independent medical examinations by Dr. Peter Holliday and by Dr. Jeffrey Fried. Neither of these examinations was conducted at the request of Hartford. Dr. Holliday, a neurosurgeon, examined Plaintiff first shortly after she left her job, on February 22, 1996, with a follow-up examination on March 14, 1996. Dr. Holliday's report indicates that Plaintiff was first referred to him by her chiropractor, Dr. Lokey. Dr. Holliday saw Plaintiff again on February 16, 1999, this time, it appears, on the referral of an attorney involved in her workers compensation case. R0227, R0248. On this third visit, Dr. Holliday conducted a physical examination of Plaintiff, noted her subjective reports of pain, and reviewed the 1998 MRI reports. Based on his examination of Plaintiff and the MRI, he concluded:

> With her current condition, I believe she could return to work at light duty or sedentary as long as she did not have to work with any extension of her neck or with her arms above shoulder height. She should probably not have to lift more than 10 pounds. The three level thoraco-lumbar degenerative disc problem will require that she alter her sitting every 60-90 minutes and probably have a special lumbar support chair and maybe wear a lumbar corset.

10

R0249-50.  Dr. Holliday's report was not provided to Hartford until August 25, 2003.  R0534.

Another independent examination was conducted by Dr. Jeffrey Fried on July 15, 1998. Although Dr. Fried's report does not identify his medical speciality or state the purpose of the examination, a letter from Plaintiff to Hartford indicates that Dr. Fried is an orthopedic surgeon and that the examination was conducted in the context of Plaintiff's workers compensation case.  R0225, R0227.  The report was first provided to Hartford on August 11, 1998.  R0619.  Dr. Fried reviewed Plaintiff's medical records, including Dr. Holliday's 1996 reports and Plaintiff's 1998 MRI results, and spoke with Plaintiff about the history of her symptoms.  He also conducted his own physical examination.  He concludes in his report that Plaintiff "could just perform sedentary work" but "shouldn't do any lifting over 10 lbs. or repeated pushing, pulling, or lifting."  R0253.

Viewed from a distance, the opinions of Dr. Fried and Dr. Holliday and the three FCEs are persuasive evidence that Plaintiff did not meet the definition of disability in the policy.  All five reports find that Plaintiff is limited by her spinal condition, but remains capable of performing full-time, sedentary work.  The most persuasive evidence in the record is the report of Dr. Holliday.  As a neurosurgeon, he specializes in the field of spinal problems and thus has extensive experience with the kind of problems Plaintiff experienced.  He personally conducted a physical examination of Plaintiff.  He also reviewed her MRI results and took into account her personal history and subjective reports of pain.  He has no apparent bias in the case, as he was not hired by Hartford and was not Plaintiff's personal physician.

The conclusions of Dr. Fried and the three FCEs are similarly persuasive.  As an orthopedic surgeon Dr. Fried, too, is a specialist in a field closely connected to Plaintiff's particular condition. Like Dr. Holliday, he conducted a physical examination of Plaintiff, reviewed her MRIs, and

listened to her description of the effects of her condition.  Moreover, he, too, was a truly independent physician, not directly associated with either party in this case.  The FCEs are persuasive in that they are based on actual, physical testing and observation of Plaintiff's abilities and limitations.

In support of her claim of disability, Plaintiff primarily relies on her own subjective reports of pain and on the opinions of her personal treating doctors.  A patient's subjective reports of pain must be taken into account, as pain is an inherently subjective experience.  Oliver v. Coca Cola Co., 497 F.3d 1181, 1196 (11th Cir. 2007), vacated in part, on other grounds, 506 F.3d 1316 (2007).  However, plan administrators "are not required to automatically give significant weight to all subjective complaints," but may also consider the extent to which objective medical evidence supports or contradicts subjective reports of pain. See Gietz-Richardson v. Hartford Life and Acc. Ins. Co., 536 F.Supp.2d 1280, 1292 (M.D.Fla. 2008). Nothing in ERISA "suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).  An insurer is entitled to weigh the conclusions of an insured's personal physicians against the conclusions of other professionals, with due regard for the relative qualifications of the various providers and for the objective bases of their opinions.  To the extent that a treating physician relies upon a patient's subjective complaints of pain, the administrator need not give special deference to the complaints "simply because the symptoms were first passed through the intermediate step of self-reporting to a medical [professional]."  Giertz-Richardson, 536 F.Supp.2d at 1292 (quoting Hufford v. Harris Corp., 322 F.Supp.2d 1345, 1356 (M.D.Fla. 2004)).

12

In this case, there are several reasons to give greater weight to the opinions of Dr. Holliday and Dr. Fried than to the opinions of Plaintiff's treating doctors.  First, as noted above, Dr. Holliday is a specialist in the field of neurosurgery and thus more experienced with regard to the specific conditions experienced by Plaintiff than Dr. Jones-Freeman, and internal medicine specialist, and Dr. Hogan, who describes himself as a doctor of general medicine and surgery.  As an orthopedic surgeon, Dr. Fried would also have specialized training with regard to spinal conditions.  Second, neither Dr. Holliday nor Dr. Fried has any apparent connection to either party in the case.  In insurance coverage cases such as this one, there is often a concern that physicians retained by the insurer will be tempted, consciously or subconsciously, to skew their findings in the interests of their employer.  See Black & Decker v. Nord, 538 U.S. at 832.  There is also a concern that the insured's personal physicians will be tempted, consciously or subconsciously, to skew their findings out of personal loyalty or concern for a regular patient.  Id. It does not appear that Dr. Holliday or Dr. Fried had any connection to either Hartford or Plaintiff, and thus their opinions have a notable degree of objectivity.  Finally, both Dr. Holliday and Dr. Fried give detailed descriptions of the objective factors that support their conclusions.  Both doctors conducted a physical examination of Plaintiff, reviewed her MRI results, and took into account her subjective representations of pain and disability.  These factors are described in detail in their reports, particularly in Dr. Holliday's report.  By contrast, Dr. Jones-Freeman does not detail any objective basis for her opinion and appears to rely primarily on Plaintiff's representations as to her limitations.  Dr. Lokey's correspondence with Hartford also lacks specific objective findings and relies on Plaintiff's reports of pain.

Dr. Hogan does indicate in his August 25, 2003 letter that he performed a physical examination and concludes based on his examination that Plaintiff had a "severe cervical range of

motion restriction" and "a restricted range of spinal motion in all parameters." R0235. He does not discuss Plaintiff's MRI results, however, and much of his letter is a restatement of Plaintiff's own description of her daily activities and limitations.

Dr. Hogan's observation as to Plaintiff's restricted range of motion is not necessarily inconsistent with the findings of Dr. Holliday and Dr. Fried or with the results of Plaintiff's FCEs. All of these reports acknowledge that Plaintiff's spinal condition significantly limits her ability to perform physical tasks. All suggest limitations as to lifting, pushing, or pulling more than ten pounds; as to repetitive bending or twisting at the waist; and as to any sustained overhead lifting or elevated work. Dr. Holliday notes that Plaintiff's degenerative disc problem might require frequent changes in posture and special lumbar support. R0250. Nonetheless, he concludes, along with Dr. Fried and the three FCEs, that Plaintiff is capable of sedentary work.

Finally, Hartford's record includes a surveillance video that adds some weight to its conclusion, even if it is inconclusive by itself. The video calls into question Plaintiff's representations as to the severity of her limitations and suggests that she would be capable of doing light or sedentary work. The video shows Plaintiff in her car running errands over a five-hour period on December 10, 2004. Plaintiff was filmed leaving her residence at 9:16 a.m., remaining in her car for 34 minutes as she drove first to a drive-through bank window and then to a pharmacy. After less than five minutes at the pharmacy, Plaintiff drove to her chiropractor's office. She remained inside the chiropractor's office for 37 minutes. From the chiropractor's office she drove to a nearby thrift store. The investigator conducting the surveillance followed Plaintiff into the store and continued to film her as she shopped there for 53 minutes. Plaintiff remained on her feet and carried a shopping basket in one hand for the entire 53 minutes. She can be observed on the video walking

normally, bending from the waist to pick up items off of lower shelves, reaching over shoulder level and over her head to pick up items off of higher shelves, and holding clothing items above shoulder level to look at them.  Several times she  squats fully and reaches out to pick up items from a floor-level shelf.  Twice she stands on one leg while removing her shoe and trying on another.  Each time her movements are fluid and there is no sign of pain or discomfort.  Plaintiff's shopping basket appears to be full by the time she checks out of the thrift store, when she is seen carrying the basket in her right hand and another item in the left.

After Plaintiff leaves the thrift store, the video shows her driving to a Target store.  Plaintiff remains inside the store for an hour.  She is shown pushing a shopping cart and is on her feet the entire hour.  Again, Plaintiff can be seen reaching for items at all levels, including above shoulder level, and squatting down to floor level without difficulty.   She makes abrupt turns with her shopping cart.  She continues to move normally and gives no sign of pain or discomfort.  From Target Plaintiff drives to the grocery store.  The investigator does not follow her inside, but she remains in the store for 43 minutes.  When she emerges from the store, she is pushing a cart full of groceries.  She loads the groceries into the trunk of her car, lifting two bags at a time and holding them in front of her body to lower them into the trunk.  She also bends from the waist and picks up a large sack of potatoes from the bottom part of the cart.  She is able to pick up the potatoes without difficulty with one hand, and gives no sign of pain of discomfort.   From the grocery store, Plaintiff makes a 24 minute drive to her house and the video ends.

Although Plaintiff has correctly pointed out that the video by itself is not dispositive, it does call into question her subjective representations as to the extent of her disability.  As Plaintiff has noted, surveillance was conducted on four separate days.  Plaintiff was observed outside the house

on only two of the four days.  On the first of those two days, November 29, 2004, Plaintiff was filmed leaving the house for just a few minutes to pick up a newspaper. There is no evidence regarding her activities inside her house, except for her own statements.  When confronted with the surveillance video during an interview on January 20, 2005, Plaintiff explained that the tape depicted her activities on a "good day," and explained that she had such days only once or twice per month. She also noted that she began the day with a chiropractic adjustment, which provided her with some temporary relief.  Because of the flaws that Plaintiff points out, the video is not conclusive and is of only limited value in assessing Plaintiff's capacities for full-time work.

Despite its flaws, the video shows Plaintiff in a range of activities that are remarkable for someone who might be totally disabled by a back injury, and are generally consistent with the observations of the FCE reports.  She is on her feet for a period of three hours, with two breaks of approximately ten minutes to drive between stores.  She is in her car for a total of 83 minutes, with the longest single period in the car being 34 minutes.  She is observed squatting several times, bending at the waist, and reaching over her head.  She carries a shopping basket for 53 minutes and pushes a shopping cart for one hour and again for 43 minutes.  Twice she balances on one foot while carrying a shopping basket in one hand and trying on a shoe with the other.  After three and a half hours of uninterrupted shopping and driving she is able to bend at the waist to pick up a ten pound bag of potatoes with one hand and place it in the trunk of her car.  During none of these activities is there any indication of pain or hesitation.  When added to the conclusions of the physicians and the FCEs, the video supports Hartford's determination that Plaintiff's condition does not meet the Policy's definition of total disability.

The weight of the evidence on record, therefore, supports a finding that Plaintiff is capable of performing sedentary work and that her disability does not render her continuously unable to engage in any occupation for which she is qualified.  Admittedly, this is a close call.  Back injuries can be painful and troubling, and it is undeniable from Plaintiff's MRI results that she has significant limitations as a result.  Given the extent of her injuries, her subjective representations as to pain and discomfort cannot be discounted.  However, the Court can only review a claim for benefits under an ERISA based on the evidence that was before the Plan administrator when the decision was made.  In this case there is a great deal of credible evidence from reliable professionals to indicate that Plaintiff is still capable of being productive in the workforce in a sedentary type of job, despite her limitations.

**B.      Arbitrary and Capricious review**

Because the evidence favors Hartford's decision, the denial of benefits would be affirmed even without a deferential standard of review.  The result on *de novo* review is a close call, however.  Although the weight of the record supports a finding that Plaintiff was not disabled from performing any occupation, the evidence in Plaintiff's favor is not negligible.  Accordingly, some attention to the arbitrary and capricious standard of review is warranted.  Under that standard, even if the scales tipped in the other direction and Hartford's decision were found to be wrong, it must be considered a reasonable decision under the circumstances.  There are no factors in evidence to indicate that the decision was arbitrary and capricious or that Hartford's conflict of interest improperly influenced its exercise of discretion.

When an ERISA plan vests the administrator or fiduciary with discretion to determine eligibility for benefits, as in this case, the fiduciary's decision is entitled to deference unless it was

arbitrary and capricious. If the decision is found to have been wrong, the court must then determine whether the administrator was arbitrary and capricious.  When conducting a review of a denial of benefits under the arbitrary and capricious standard, the court must "determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made."  Doyle, 2008 WL 4272748, *7.  In determining whether a decision is arbitrary and capricious, the court may consider whether the administrator acted under a conflict of interest.  A conflict of interest exists where the administrator "both evaluates claims for benefits and pays benefits."  Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S.Ct. 2343, 2348 (2008).  The parties agree that Hartford had such a conflict of interest, in that it both evaluated claims and paid claims from its own funds.

The application of the arbitrary and capricious standard in cases involving a conflict of interest has undergone some recent evolution.  In Metropolitan Life Ins. Co. v. Glenn, ___ U.S. ___, 128 S.Ct. 2343, 2348 (2008), the Supreme Court held that such a conflict is simply one factor that a court must take into account in determining the reasonableness of a decision to deny coverage. Prior to Glenn, courts in the Eleventh Circuit were required to apply a "heightened arbitrary and capricious" standard, using a burden-shifting analysis.  See Doyle, 511 F.3d at 1340.  If a denial of benefits was found to be wrong but reasonable, the burden shifted to the conflicted fiduciary "to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest."  Id. (quoting Brown v. Blue Cross & Blue Shield of Ala., Inc., 898 F.2d 1556, 1566 (11th

Cir. 1990)).  The fiduciary could meet this burden by showing that its decision was justified "on the ground of its benefit to the class of all participants and beneficiaries."  Id.[3]

In Glenn the Supreme Court explicitly rejected burden-shifting analyses such as the heightened arbitrary and capricious standard mandated by the decisions of the Eleventh Circuit. According to Glenn, the fiduciary's conflict of interest is to be considered as one factor in evaluating a decision's reasonableness, not as a separate analysis:

> Neither do we believe it necessary or desirable for courts to create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict.  In principle, as we have said, conflicts are but one factor among many that a reviewing judge must take into account.

128 S.Ct. at 2351.  In determining whether a denial of benefits is arbitrary and capricious, therefore, a court must take into account "several different, often case-specific, factors, reaching a result by weighing all together."  Id.  Among these factors is any conflict of interest, which itself must be weighed with regard to its nature and its relationship to the decision:

> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has

---

[3]District courts in the Eleventh Circuit found this heightened arbitrary and capricious standard "hopelessly awkward" and expressed frustration at attempts to apply it in practice, particularly in cases where a fiduciary's factual determination was at issue.  See, e.g., Wise v. Hartford Life and Accident Insurance Co., 360 F. Supp. 2d 1310, 1321-22 (N.D. Ga. 2005).  Prior to the decision in Glenn, the Eleventh Circuit panel in Doyle acknowledged that the heightened standard was "flawed" and recommended that the Court of Appeals "review en banc this troublesome heightened standard and consider adopting a more workable standard to apply in factual determination cases."  Doyle, 511 F.3d at 1346.

a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

Id.  Glenn thus prescribes a balanced, "combination-of-factors" method for reviewing a fiduciary's decision to deny benefits.

The Supreme Court applied this method to the facts in Glenn, to find that the fiduciary's conflict of interest weighed too heavily in favor of denying coverage.  In Glenn, as in this case, the plaintiff received benefits during the two-year "own occupation" period, but was denied coverage under the subsequent "any occupation" provisions of the policy.  At the same time, the fiduciary (MetLife)encouraged the plaintiff to apply for disability benefits from the Social Security Administration, and even directed her to a law firm to assist in her application.   When an Administrative Law Judge found that the plaintiff's disability prevented her from performing any jobs for which she was qualified and granted her claim for benefits, MetLife reaped all the benefit, taking the entire benefits award, after attorney's fees, to offset its own benefits payments.  MetLife then determined, contrary to the decision of the ALJ, that the plaintiff was capable of performing sedentary work and thus was not eligible to receive benefits at the expiration of the "own occupation" period.     The Court of Appeals for the Sixth Circuit set aside MetLife's decision to deny benefits, finding that MetLife's decision was arbitrary and capricious.  The court's finding was based on a combination of several circumstances:

> (1) the conflict of interest; (2) MetLife's failure to reconcile its own conclusion that Glenn could work in other jobs with the Social Security Administration's conclusion

> that she could not; (3) MetLife's focus upon one treating physician report suggesting
> that Glenn could work in other jobs at the expense of other, more detailed treating
> physician reports indicating that she could not; (4) MetLife's failure to provide all
> of the treating physician reports to its own hired experts; and (5) MetLife's failure
> to take account of evidence indicating that stress aggravated Glenn's condition.

Glenn, 128 S.Ct. at 2346.  The Supreme Court affirmed, finding that these factors, considered

together, indicated an abuse of the fiduciary's discretion.  The conflict of interest was only one

factor in the Court's analysis, and was not itself conclusive.  The Court explains how the conflict

of interest weighs with other facts and circumstances of the benefits denial to evidence an arbitrary

and capricious decision:

> The Court of Appeals' opinion in the present case illustrates the
> combination-of-factors method of review.  The record says little about MetLife's
> efforts to assure accurate claims assessment.  The Court of Appeals gave the conflict
> weight to some degree; its opinion suggests that, in context, the court would not have
> found the conflict alone determinative.  The court instead focused more heavily on
> other factors. In particular, the court found questionable the fact that MetLife had
> encouraged Glenn to argue to the Social Security Administration that she could do
> no work, received the bulk of the benefits of her success in doing so (the remainder
> going to the lawyers it recommended), and then ignored the agency's finding in
> concluding that Glenn could in fact do sedentary work. This course of events was not
> only an important factor in its own right (because it suggested procedural
> unreasonableness), but also would have justified the court in giving more weight to
> the conflict (because MetLife's seemingly inconsistent positions were both
> financially advantageous).  And the court furthermore observed that MetLife had
> emphasized a certain medical report that favored a denial of benefits, had
> deemphasized certain other reports that suggested a contrary conclusion, and had
> failed to provide its independent vocational and medical experts with all of the
> relevant evidence.  All these serious concerns, taken together with some degree of

> conflicting interests on MetLife's part, led the court to set aside MetLife's
> discretionary decision.  We can find nothing improper in the way in which the court
> conducted its review.

128 S.Ct at 2351-52.  The circumstances of the case, particularly the fiduciary's inconsistent position with regard to the plaintiff's claim for Social Security disability benefits, indicated that the fiduciary's desire to avoid paying a claim outweighed its neutral judgment.  All the factors, considered together, supported a finding that the decision to deny benefits was arbitrary and capricious.

The Eleventh Circuit has determined the <u>Glenn</u> "implicitly overrules and conflicts with [its] precedent requiring courts to review under the heightened standard a conflicted administrator's benefits decision."  <u>Doyle</u>, 2008 WL 4272748, *6.  In <u>Doyle</u>, the court abandoned the burden-shifting analysis of the prior heightened standard and followed the Supreme Court's "combination of factors" approach:

> We hold that the existence of a conflict of interest should merely be a factor for the
> district court to take into account when determining whether an administrator's
> decision was arbitrary and capricious. And we hold that, while the reviewing court
> must take into account an administrative conflict when determining whether an
> administrator's decision was arbitrary and capricious, the burden remains on the
> plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove
> its decision was not tainted by self-interest.

<u>Id</u>. at *7.  The burden of proof remains on the Plaintiff throughout the process to show that the administrator's decision was arbitrary and capricious.

Applying the "combination of factors" analysis prescribed in <u>Glenn</u> and <u>Doyle</u>, the analysis in this case begins with a *de novo* review of the denial and concludes with an arbitrary and capricious review that takes into account the existence of the conflict of interest as one factor that

might suggest an arbitrary and capricious decision.  The Court must first consider whether Hartford's decision was correct based on the record of evidence that was available to it.  To the extent that the decision was incorrect, the Court must then consider all of the factors and circumstances of the decision to determine whether it was nevertheless reasonable.  A wrong but reasonable decision would not be arbitrary and capricious, but would be within Hartford's discretion as Plan fiduciary.

Although the evidence in this case warrants an affirmation of Hartford's decision on *de novo* review, even if Hartford's decision were found to be wrong, it is at least a reasonable decision under the circumstances.  There are no factors in evidence to indicate that the decision was arbitrary and capricious or that Hartford's conflict of interest improperly influenced its exercise of discretion. The evidence in the record shows that the decision was reasonable and supported by substantial objective evidence.

There is nothing in the totality of the circumstances that indicates that Hartford's conflict of interest was a major factor in its decision.  Indeed, Hartford and its predecessors continued to pay Plaintiff benefits for nearly ten years while it wrestled with the question of her eligibility.  Hartford investigated the case thoroughly and developed a complete and thorough record as to Plaintiff's condition.  It gave Plaintiff numerous opportunities to respond to its decision to deny benefits and even reversed its decision to cut off benefits on two prior occasions.  This suggests that for Hartford, as for the Court, the question of Plaintiff's eligibility for benefits was a close one.

In contrast with MetLife in <u>Glenn</u>, Hartford in this case based its decision not on the opinion of one treating physician, but on the opinions of two independent specialists and three Functional Capacity Evaluations.  The doctors who performed the Independent Medical Examinations were not

affiliated with or hired by Hartford, and their opinions were based on actual physical examinations of the Plaintiff and a thorough consideration of Plaintiff's medical history, including her MRI reports and her own descriptions of her condition.  In further contrast with <u>Glenn</u>, in this case there was no inconsistent position taken with regard to the disability benefits from the Social Security Administration.  To the contrary, an Administrative Law Judge rejected Plaintiff's claim for Social Security disability benefits for much the same reason that Hartford rejected Plaintiff's claim.  These factors demonstrate that Hartford's decision was not arbitrary and capricious, but was careful and thoughtful.

**CONCLUSION**

Whereas Hartford's decision to deny benefits was correct and consistent with the weight of evidence in the record, and whereas it was not arbitrary and capricious, the decision must be affirmed.  Accordingly, the Clerk of Court is hereby directed to enter judgment in favor of Defendant and against Plaintiff.

**SO ORDERED**, this 25th day of September, 2008.

<u>S/ C. Ashley Royal </u>
C. ASHLEY ROYAL
UNITED STATES DISTRICT COURT

chw